Filed 8/20/25  P. v. Esparza CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B336895 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. XSCTA147621) |
| v. | |
| ANGEL ESPARZA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hector E. Gutierrez, Judge.  Affirmed.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle and Lauren Sanchez, Deputy Attorneys General for Plaintiff and Respondent.

The jury found Angel Esparza guilty of murder (Pen. Code,[1] § 187, subd. (a), count 1), unlawful possession of a firearm (§ 29800, subd. (a)(1), count 2), and unlawful possession of ammunition (§ 30305, subd. (a)(1), count 3). The jury found true firearm allegations in count 1. (§ 12022.53, subds. (b)-(d).) The trial court sentenced Esparza to 50 years to life in prison in that count, plus a concurrent determinate term of two years in count 2. The court imposed and stayed a term of two years in count 3.

On appeal, Esparza contends that the trial court erred by admitting the prior recorded statements of his ex-girlfriend, who claimed to have no memory of her interview with the police.

We affirm the judgment.

## FACTS[2]

In February 2018, Adrian Ramos and his girlfriend Kimberly Corona lived in an abandoned garage in Compton. Many people, including Ramos and Corona, used the garage as a place to hang out and do drugs. On the night of February 6, 2018, Esparza entered the garage and fired a single bullet into Ramos's chest at close range, killing him. Several people were in

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Esparza does not challenge his convictions in counts 2 and 3, or argue that he did not shoot and kill Adrian Ramos. We have therefore limited the facts to those relevant to his mental state at the time of the shooting, which is the sole issue in contention on appeal.

the garage at the time of the shooting, including three eyewitnesses who testified for the prosecution.

## A.    *Victor Rivera*

Victor Rivera testified that he was at the abandoned garage earlier in the day on February 6, 2018. Andres Maciel and some other young men arrived in the afternoon and were trying to intimidate Ramos. Maciel told Rivera that Ramos had been "talking shit" about Maciel. Maciel boasted that "big people" in a gang had given him permission to kill Ramos. Rivera believed that Maciel told him this to warn Rivera not to interfere. Maciel and the others left as it was getting dark.

Later that evening, Maciel returned with Esparza and others, including a large man known as "Chubs." They exited their car but left the engine running. Esparza and Maciel began arguing with Ramos in the back yard. They repeatedly insisted that Corona leave Ramos and go with Maciel. Ramos told them that Corona did not want to leave, but they insisted. Corona told Esparza and Maciel that she did not want to leave. The argument escalated. Maciel grabbed Ramos in a kind of hug and said, "She's mine." Then Chubs pushed Ramos into the garage using his body weight.

Rivera was inside the garage, sitting to the side on a couch. Rivera believed that Maciel was looking for a fight because Maciel had returned to the garage with back-up. Rivera became concerned when he realized what the men were going to do. He tried to keep the peace. He told everyone in the garage, " 'It's not your business. It's between [Maciel, Ramos, and Corona]. It's a girl thing.' " Rivera was focused on Esparza, who "came [at

3

Ramos] with full force." Esparza was standing right in front of Ramos, who was next to Corona. Ramos said, "Let's catch a face," which means "Let's fight." He said he would fight either Maciel or Esparza. Maciel did not enter the garage. He stayed behind Esparza the entire time. Esparza responded, " 'No, fuck a face.' " Rivera saw Esparza extend his arm and then heard a gunshot.[3] Rivera ducked down and hid, and everyone started running out of the garage. Maciel, Esparza, and the others ran to their car and drove off as Ramos lay on the floor dying. The police arrived soon afterwards.

A few days later, Rivera ran into Esparza on the street and told him that it was wrong to shoot Ramos. Esparza responded, " 'We're straight. Are you and me straight?' " Rivera replied, " 'That's up to you.' " Rivera told Esparza that he should not have killed Ramos because Ramos was not a gang banger. Esparza acted "like he didn't give a fuck." Rivera was angry at the way Esparza had killed Ramos. He thought Esparza was cowardly for shooting Ramos instead of fighting him. Rivera thought Esparza shot Ramos "over some stupid things[,]" just "for the fuck of it."

Rivera was addicted to crack cocaine. Rivera testified that he was under the influence of drugs at the time of the murder, so he could only remember "the main things, like shooting, what happened" and not the details. Rivera never saw Ramos with a gun.

---

[3] Rivera explained that the abandoned garage was dark, so could not see the gun itself.

**B.**   *Jose Angon*

In February 2018, Jose Angon was living in the abandoned garage in Compton.  About two days before Esparza killed Ramos, Ramos confronted Maciel, who had come to the garage looking for Corona.  Previously, Corona disappeared with Maciel overnight and returned to the garage with hickies on her neck.  When Maciel showed up at the garage, Ramos chased him down the block.  Maciel ran to a friend's house for back-up.  When Maciel returned, Ramos hit Maciel in the face with a garden tool and split his mouth open.  Since then, unfamiliar cars had parked in front of the abandoned house that adjoined the garage, and people had been shooting at the house.

On February 6, 2018, Angon was in the garage with Ramos, Corona, Rivera, "Spider," and "Candy."  Everyone was on edge because of recent events.  A few hours before Ramos was killed, Chubs showed up at the garage looking for Esparza.  Chubs said Esparza told him he would meet him there.  The arrangement seemed very odd to Angon because Esparza rarely dropped by the garage.  The people in the garage told Chubs to leave, but he refused.  Spider was high and something happened between him and Chubs.  Spider asked Chubs why he was there.  Chubs started beating Spider.  Rivera and Angon separated them, and Chubs left.

Esparza arrived a little after Chubs left.  Everyone told Esparza that Chubs had been waiting for him, but Esparza acted like he did not know who Chubs was.  Angon, Corona, and Ramos walked to the store, and Esparza followed them.  Esparza said he was going the same way they were, but when they walked back to

5

the garage Esparza followed them again. Angon told Ramos that he thought Esparza intended to shoot and kill all of them or at least Ramos.

Esparza left, but he returned an hour or so later with Maciel and Chubs. Esparza, Maciel, and Ramos started arguing in the yard. The argument escalated when Maciel refused to go into the garage. Ramos and Corona went inside and everyone else followed. Esparza pulled a gun out of his waistband as soon as he walked in. He never put it down. Esparza was the first to speak. He asked Corona if she was coming or not. Maciel was hiding behind Esparza and Chubs. Ramos asked Corona what was going on and she said she did not know. Ramos told Esparza, " 'The beef ain't with you. It's with [Maciel].' " Rivera tried to stop the argument. He told Ramos that Corona was not worth it. If Corona wanted to leave, Ramos should let her go. Maciel asked Corona if she was coming or not. Corona responded that she did not know what to do. Ramos said to Maciel, " 'Let's get there[,]' " which was a challenge to fight him. Maciel did not respond; he had one foot outside the door. Esparza answered, " 'You better calm the fuck down before I shoot your ass.' " Ramos started to take off his jacket and took a few steps toward Maciel. Esparza put the gun to Ramos's heart and shot him. Angon saw Esparza fire the shot. There was not a lot of light in the garage, but Angon could see from the light coming in the door. Ramos had not been armed. Esparza, Maciel, and Chubs ran back outside. Rivera ran after Esparza and tried to throw a piece of plywood at his car. Angon just stood there in shock. He kept telling Corona that none of it would have happened if she had just left with Maciel. Corona lay on the floor crying as Ramos died. The police arrived in about five minutes.

Angon was angry when he testified.  He explained that he was upset because Maciel was still free and he had caused everything.  Maciel wanted Corona to be with him and was upset that Ramos hit him in the face but "he couldn't handle it himself.  He knew that [Esparza] was vulnerable and easy to manipulate."  "He used [Esparza] to take out [Ramos]."  Angon believed that Esparza killed Ramos because Maciel's "pride was hurt because he got beat up."

## C.  *Kimberly Corona*

In February 2018, Corona lived in the abandoned garage with Ramos, who had been her boyfriend for about a year and a half.

A few days before Ramos was killed, Esparza came to the garage looking for "Trigger" because he thought Trigger had scarred Maciel's face.  Ramos told Esparza he was the one who hit Maciel.  Esparza responded that he would be back for Ramos, and left.  At the preliminary hearing, Corona testified that two days before the killing Esparza said he was going to kill Trigger because he hit Maciel.  Ramos asked Esparza why he would kill Trigger when Ramos cut Maciel.  At trial, Corona admitted that her preliminary hearing testimony was accurate.

On February 6, 2018, Esparza came to the garage with about six other people, including Chubs and Maciel.  Maciel was standing behind Esparza.  Esparza and Maciel kept telling Corona " 'Let's go.' "  Corona told them she did not want to go with them.  Corona did not know where they wanted to take her.  Corona did not know why Maciel would come and try to get her to leave.  Esparza and Maciel were "talking shit" to Ramos.

7

Esparza was only "steps away" from Ramos, who was unarmed. At first Esparza, Maciel, and Ramos were arguing and then everyone began to argue. Corona and Ramos hugged each other. Corona looked up, saw muzzle flash coming from Esparza's sweater, and heard a gunshot. Ramos fell down. Corona, Angon, and Spider stayed with Ramos. Everyone else ran out of the garage. Corona did not remember whether Angon got angry at her and said that it was her fault. She was in shock.

Corona testified that Ramos had confronted her about the marks on her neck when she returned after being gone for more than a day. Corona told Ramos they were not hickies. Corona did not remember if the hickey incident precipitated the confrontation between Ramos and Maciel. Corona knew Maciel and Ramos were arguing, but she did not know what caused the problem between them. Ramos told Corona, " 'I hit that [guy,]' " but he did not say who he hit or why he did it. Corona could not remember if Ramos received threatening text messages from Maciel shortly before Ramos died. Ramos never told Corona he was receiving threatening messages from Maciel. Corona could not remember the last time she talked to Maciel before the shooting. She did not think Maciel planned to do something to Ramos. She could not remember if she and Maciel discussed the possibility that she would leave Ramos and start a relationship with Maciel.

Corona became pregnant with Maciel's child in February of 2018, right after Ramos was killed. She had a second child with Maciel, and was still in a relationship with him at the time of the trial.

**DISCUSSION**

Esparza's sole contention on appeal is that the trial court improperly admitted his former girlfriend Reyna Garcia's statements to police officers in a recorded interview. Esparza argues that Garcia did not testify inconsistently with her prior statements; rather, she testified that she did not recall the interview at all because her memory was severely impaired at that time by her mental health problems and her heavy use of drugs and alcohol. Esparza claims the trial court's admission of Garcia's statements violated both state and federal law, and the court's error cannot be deemed harmless beyond a reasonable doubt. Esparza argues that if the jury had not considered Garcia's prior statements it may not have found that he intended to kill Ramos or that he acted with premeditation and deliberation, and instead conclude that he committed voluntary manslaughter under a heat of passion, reasonable self-defense, or unreasonable self-defense theory. We conclude that, even assuming (without deciding) that Garcia's prior inconsistent statements were admitted in error, such error was harmless under any standard.

### A. *Facts and Procedural History*

#### 1. February 14, 2018 Interview with Police

Reyna Garcia was dating Esparza at the time of the killing. She was arrested in an unrelated matter in 2018. On February 14, 2018, she participated in a recorded interview with

police regarding her knowledge of the events in the present case. The following is a transcript of the unredacted portions of that interview as played for the jury at trial, omitting only questions regarding Garcia's name and date of birth:

[Officer:] "Angel?

[Garcia:] "Name is Angel little woods.

[Officer:] "Little Woods. What's his last name?

[Garcia]: "Esparza. . . .

[Officer:] "Esparza. Okay. And then, how do you know Angel?

[Garcia:] "He's my boyfriend.

[Officer:] "Okay. Did you ever find out what he—what deputies were looking for him for?

[Garcia:] "He told me.

[Officer:] "What did he tell you?

[Garcia:] "For killing—he told me so. Ah yeah, Reyna, yeah Reyna, I fucking killed [Ramos]. I killed [Ramos]. I don't give a fuck. You know, that mother fucker tried to get crazy so I fucking—yep, I put the gun to his chest and said shut the fuck up sit back mother fucker. And then—and then I shot him again, and then I shot him again. Yeah, yeah.

*     *     *

[Officer:] "Reyna, so let me ask you this, is there anything else about specifically about what he told you about that shooting? Is there anything else that you want to tell us?

[Garcia:] "He said 'cause of [Maciel].'

[Officer:] "Uh-huh. What did he say about [Maciel]?

[Garcia:] "I guess it's that its—that they hit [Maciel] with a bat."

## 2. **Trial**

At trial, Garcia testified that she was arrested several times in 2018 and 2019. She admitted that she was convicted for illegally possessing a weapon in a felony case and convicted of first degree residential burglary. She used drugs frequently at that time. Garcia broke off the relationship with Esparza sometime in 2018.

Garcia testified that she did not recall being arrested and asking to speak to a detective or telling the detective that Esparza told her he killed Ramos. Garcia could not recall if she spoke to Esparza regarding Ramos's death between February 6 and February 13, 2018.

At a sidebar, defense counsel requested that the court make a finding regarding whether Garcia's memory lapse was credible or if she was intentionally evading questions.

The court determined, "based on watching her and how she's answering, that she's intentionally saying 'I don't remember' to avoid answering the question." "From what I've observed thus far, it appears to me that just based on her demeanor, she's not hesitating when she says 'I don't remember.' It's almost immediately. It's the court's view that she is saying that to avoid answering the questions and that it's intentional versus a lack of memory." Defense counsel requested an evidentiary hearing based on surprise—counsel had expected Garcia to testify consistently with her prior statements. The court declined the request. The prosecutor informed the court that she had disclosed to defense counsel that Garcia told the prosecutor she did not know why she was being called as a witness and did not remember anything.

11

Trial resumed, and Garcia testified that she did not recall having a recorded interview with police in 2018. Garcia did not remember Esparza telling her that he put a gun to Ramos's chest, told Ramos to shut up and sit back, and then shot Ramos. She did not recall telling the detective that Esparza told her he killed Ramos because Ramos hit Maciel with a bat. Garcia did not think looking at a transcript of the interview would refresh her memory. She was on PCP at the time of the interview.

The prosecutor asked the court's permission to play a recording of Garcia's February 14, 2018 interview, which the court granted.

After the jury listened to the recording, Garcia testified that it was her voice in the interview, but that she did not remember any of the interview. She explained that she was addicted to drugs and living under a bridge at the time, so she did not remember much of anything. Garcia was surprised to be called as a witness. She had been diagnosed with schizoaffective type bipolar and was taking medication for her condition at the time of trial.

Garcia did not remember trying to get out of jail by giving police information in Esparza's case. Garcia did not remember Esparza telling her he did any of the things that she said he did in the interview. Garcia believed that her memory was impaired by a psychotic breakdown that was escalated by methamphetamines and PCP. She did not have a clear recollection of any events that occurred in 2018 or in 2019 before July 27, 2019, when she was arrested. Garcia did not remember talking to anyone about the shooting. She did not know when the murder took place.

In another sidebar discussion, defense counsel requested that the court reconsider its finding that Garcia was intentionally evading questions. The court responded: "I think two things can be true at the same time, which is that she does have a memory and she's intentionally saying 'I don't remember,' also that she was a really bad drug addict and it has affected her ability to perhaps recollect some details. [¶] I'll note that one thing hasn't changed for me is she didn't hesitate at all when [the prosecutor] would ask her these direct questions. It almost seemed like she was [*sic*] prepared her answers. I mean, it was very quick. I don't remember. I don't remember. So that's significant to the court." Defense counsel moved to strike Garcia's testimony based on the prosecutor's impeachment with a prior statement. The motion was denied. The court excused Garcia subject to recall.

## B.     *Legal Principles*

"A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion, and it will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." (*People v. Wall* (2017) 3 Cal.5th 1048, 1069.)

"A witness's out-of-court statement 'is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with [Evidence Code s]ection 770.' (Evid. Code, § 1235.) Evidence Code section 770, subdivision (a) in turn, requires that the witness have 'an opportunity to explain or to deny the

13

[inconsistent] statement' while testifying." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 766–767.)

"In order to admit the prior extrajudicial statement of a forgetful witness as an inconsistent statement, the forgetfulness must be feigned . . . ." (*People v. Gunder* (2007) 151 Cal.App.4th 412, 418.) " 'Ordinarily, a witness's inability to remember an event is not inconsistent with that witness's prior statement describing the event. [Citation.]' " (*People v. Anderson* (2018) 5 Cal.5th 372, 403.) " ' " '[P]rior statements are not admissible to impeach a witness whose answers to questions are *exclusively* of the "I-don't-remember' variety.' " ' " (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1076, quoting *People v. Fierro* (1991) 1 Cal.4th 173, 222, original italics; see also *People v. Sam* (1969) 71 Cal.2d 194, 209.) " 'When, however, "a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied." ' [Citation.]" (*People v. Anderson*, *supra*, at p. 403.) "The determination is for the trial court, which we affirm if there is a reasonable basis in the record for its conclusion." (*Gunder*, *supra*, at p. 418.)

**C.   *Analysis***

We conclude that any prejudice stemming from admission of Garcia's prior inconsistent statements is harmless under both *Chapman v. California* (1967) 386 U.S. 18, 24 (harmless beyond a reasonable doubt) and *People v. Watson* (1956) 46 Cal.2d 818, 836 (reasonable probability of a more favorable outcome).

At trial, the prosecution produced overwhelming evidence that Esparza intended to kill Ramos and that the killing was

14

willful, deliberate, and premeditated rather than the product of heat of passion or some form of self-defense or defense of others.

The evidence showed that Esparza was angry that Ramos had beaten Maciel, and planned to kill Ramos to avenge Maciel. Angon testified that Ramos hit Maciel and split his mouth open in a fight over Corona a few days before the murder. Corona testified that Esparza said he was looking for Trigger to kill him because he believed Trigger hit Maciel. When Ramos said that he was the person who cut Maciel, Esparza promised to return to get Ramos. Rivera testified that on the afternoon of February 6, 2018, Maciel told him that higher-ups in a gang had given him permission to kill Ramos, which Rivera understood to be a warning not to stand in the way when Ramos was killed.

Angon testified that on the night of the murder, Chubs came to the garage and said Esparza told him to meet him there. Angon thought this was strange because Esparza rarely went to the garage. Later, when Esparza was told Chubs had been waiting for him, he acted like he did not know who Chubs was. Esparza followed Ramos, Angon, and Corona to the store under the pretense that he was going the same way, but then followed them back to the garage afterwards. When Esparza returned to the garage later that night, he had Maciel and Chubs with him. Esparza immediately argued with Ramos about Corona, and followed Ramos into the garage. Angon testified that as soon as Esparza entered the garage he drew his gun and never put it down. Ramos told Esparza that the problem was between him and Maciel. When Esparza persisted, Ramos said he would fight either of them. Maciel stayed behind Esparza and Chubs the entire time, and had one foot out the door. Esparza said "Fuck [fighting]" and "came [at Ramos] with full force." He aimed his

15

gun at Ramos's chest and shot him. Esparza and the others fled in a car that they left running outside. A few days later, Rivera confronted Esparza about Ramos's killing. Esparza acted "like he didn't give a fuck."

All of the witnesses testified that Esparza was the aggressor. He came to the garage with Chubs and Maciel to start a fight. Esparza persisted in the argument despite Ramos and others telling him that the problem did not concern him. He brought a loaded firearm, and pulled it out as soon as he entered the garage. When Ramos said he would fight either man, Esparza shot him point blank. There was no evidence that Esparza believed, reasonably or unreasonably, that he needed to defend either himself or Maciel, who was behind him the entire time with one foot out of the door.

Garcia's prior statements provided only cumulative evidence. She said that Esparza killed Ramos—something that all three eyewitnesses saw and attested to—and that he killed Ramos "cause of [Maciel]," who Ramos had hit—which was corroborated by both Rivera and Angon. Garcia's statement that Esparza shot Ramos multiple times was demonstrably false—all of the witnesses testified that Ramos was shot only once, which was confirmed by the ballistics evidence. The prosecution did not need to rely on this evidence to demonstrate Esparza's callous attitude regarding the shooting; Rivera attested to Esparza's complete lack of remorse in the aftermath of the killing.

In light of the overwhelming evidence that Esparza intended to kill Ramos and acted with premeditation and deliberation, we conclude that Garcia's brief, self-serving statement, which included blatantly false information regarding the shooting, was harmless beyond a reasonable doubt.

## DISPOSITION

We affirm the trial court's judgment.
NOT TO BE PUBLISHED.


MOOR, J.

I CONCUR:


HOFFSTADT, P. J.

17

The People v. Angel Esparza
B336895


BAKER, J., Concurring



I do not reach the harmless error question decided by the opinion for the court because, in my view, there was no error. Relying to a substantial degree on Reyna Garcia's demeanor and haste in answering certain questions, the trial court found she was feigning a lack of memory at least to some degree. I see nothing that would permit countermanding that determination on the ground that it was an abuse of the trial court's discretion. (*People v. Cowan* (2010) 50 Cal.4th 401, 462; *People v. Ervin* (2000) 22 Cal.4th 48, 84-85; see also *In re Long* (2020) 10 Cal.5th 764, 774 [deference to trial court findings appropriate because the court has the opportunity to observe a witness's demeanor and manner of testifying].)



BAKER, J